Hagens Berman Sobol Shapiro LLP
Robert B. Carey #011186
Donald Andrew St. John #024556
11 West Jefferson Street, Suite 1000
Phoenix, Arizona 85003
Telephone: (602) 840-5900
Facsimile: (602) 840-3012
E-Mail: rcarey@hbsslaw.com
          andy@hbsslaw.com

Hagens Berman Sobol Shapiro LLP
Steve W. Berman WSBA #12536
Ari Y. Brown WSBA #29570
1918 Eighth Avenue, Suite 3300
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
E-Mail: steve@hbsslaw.com
          ari@hbsslaw.com

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Teresa Follmer, an individual; Katie and John Lividotti, husband and wife, on behalf of themselves and all others similarly situated, | ) ) ) ) |
| | ) |
| Plaintiffs, | ) ) |
| | ) |
| v. | ) ) |
| | ) |
| Bank of America, N.A. and BAC Home Loans Servicing, LP | ) ) ) |
| | ) |
| Defendants. | ) |

**CLASS ACTION**

**COMPLAINT FOR DAMAGES, RESTITUTION, AND INJUNCTIVE RELIEF**

**JURY TRIAL DEMANDED**

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ................................................................. 1

II.  JURISDICTION .................................................................. 5

III. PARTIES ............................................................................ 6

IV. FACTUAL BACKGROUND .............................................. 6

    A.   The Foreclosure Crisis ................................................ 6

    B.   Creation of the Home Affordable Modification Program ................................. 7

    C.   Duties of a Participating Servicer Under HAMP ............... 8

    D.   Plaintiffs' Effort to Obtain a Loan Modification ............. 15

        1.   Teresa Follmer ................................................. 15

        2.   John and Katie Lividotti ................................... 20

    E.   Class Allegations ...................................................... 24

COUNT I   BREACH OF CONTRACT / BREACH OF DUTY  OF GOOD FAITH and FAIR DEALING ................................. 26

COUNT II   PROMISSORY ESTOPPEL, IN THE ALTERNATIVE ................................. 28

COUNT III   CONSUMER FRAUD VIOLATION OF ARIZ. REV. STAT. §§ 44-1521 - 1534. .................................. 29

V.   PRAYER FOR RELIEF ...................................................... 30

VI.  JURY TRIAL DEMANDED................................................ 31

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## I.    INTRODUCTION

1.    In October 2008, Bank of America accepted $15 billion in funds from the United States Government as part of the Troubled Asset Relief Program ("TARP"), 12 U.S.C. § 5211.  In January 2009, in connection with its acquisition of Merrill Lynch, Bank of America accepted another $10 billion in TARP funds along with a partial guarantee against losses on $118 billion in mortgage-related assets.  By accepting this payment, Bank of America agreed that it would participate in one or more programs that TARP authorized the Secretary of the Treasury to establish necessary to minimize foreclosures.

2.    Consistent with the TARP mandate, the Treasury Department implemented the Home Affordable Modification Program ("HAMP") – a detailed program designed to stem the foreclosure crisis by providing affordable mortgage loan modifications and other alternatives to foreclosure to eligible borrowers.  Companies that accepted money under the TARP are subject to mandatory inclusion in HAMP as are certain classes of loans, namely those held by Federal National Mortgage Association ("Fannie Mae") and Federal Home Loan Mortgage Corporation ("Freddie Mac").

3.    Bank of America signed a contract with the U.S. Treasury on April 17, 2009 (attached as Exhibit 1 and included by reference) agreeing to comply with the HAMP requirements and to perform loan modification and other foreclosure prevention services described in the program guidelines.  The guidelines issued by the Treasury Department set forth a detailed process whereby a participating servicer such as Bank of America, acting through its subsidiary BAC Home Loans Servicing, must:

- identify loans that are subject to modification under the HAMP program, both through its own review and in response to requests for modification from individual homeowners;

- collect financial and other personal information from the homeowners to evaluate whether the homeowner is eligible for a loan modification under HAMP;

- institute a modified loan with a reduced payment amount as per a mandated formula, that is effective for a three-month trial period for borrowers that are eligible for a modification; and

- provide a permanently modified loan to those homeowners who comply with the requirements during the trial period.  Whether the homeowner qualifies for a modification or not, participating servicers are also required to provide written notices to every mortgage borrower that has been evaluated for a loan modification, whether or not the borrower has been found eligible.

4.     HAMP and its associated directives also set prohibitions against certain conduct including demanding upfront payments in order to be evaluated for a loan modification, instituting or continuing foreclosures while a borrower is being evaluated for a loan modification, and restrictions on the way a servicer may report the borrower to credit reporting agencies.

5.     Though Bank of America accepted $25 billion in TARP funds and entered into a contract obligating itself to comply with the HAMP directives and to extend loan modifications for the benefit of distressed homeowners, Bank of America has systematically failed to comply with the terms of the HAMP directives and has regularly and repeatedly violated several of its prohibitions.

6.     Under HAMP, the federal government incentivizes participating servicers to make adjustments to existing mortgage obligations in order to make the monthly payments more affordable.  Servicers receive $1,000.00 for each HAMP modification.  However, this incentive is countered by a number of financial factors that make it more profitable for a mortgage servicer such as Bank of America to avoid modification and to continue to keep a mortgage in a state of default or distress and to push loans toward foreclosure.  This is especially true in cases where the mortgage is owned by a third-party investor and is merely serviced by the servicer such as Bank of America.  On information and belief, Bank of

America does not own a significant majority of the loans on which it functions as a servicer.

7.     Economic factors that discourage Bank of America from meeting its contractual obligations under HAMP by facilitating loan modifications include the following:[1]

- Bank of America may be required to repurchase loans from the investor in order to permanently modify the loan.  This presents a substantial cost and loss of revenue that can be avoided by keeping the loan in a state of temporary modification or lingering default.

- The monthly service fee that Bank of America, as the servicer collects as to each loan it services in a pool of loans, is calculated as a fixed percentage of the unpaid principal balance of the loans in the pool.  Consequently, modifying a loan to reduce the principal balance results in a lower monthly fee to the servicer.

- Fees that Bank of America charges borrowers that are in default constitute a significant source of revenue to the servicer.  Aside from income Bank of America directly receives, late fees and "process management fees" are often added to the principal loan amount thereby increasing the unpaid balance in a pool of loans and increasing the amount of the servicer's monthly service fee.

- Entering into a permanent modification will often delay a servicer's ability to recover advances it is required to make to investors of the unpaid principal and interest payment of a non-performing loan.  The servicer's right to recover expenses from an investor in a loan modification, rather than a foreclosure, is often less clear and less generous.

---

[1]     *See* Thompson, Diane E., *Why Servicers Foreclose When They Should Modify and Other Puzzles of Servicer Behavior*, National Consumer Law Center (October 2009).

- 3 -

- Fixed overhead costs involved in successfully performing loan modifications involve up-front cost to the servicer for additional staffing, physical infrastructure, and expenses such as property valuation, credit reports and financing costs.

8.　　Rather than allocating adequate resources and working diligently to reduce the number of loans in danger of default by establishing permanent modifications, Bank of America has serially strung out, delayed, and otherwise hindered the modification processes that it contractually undertook to facilitate when it accepted billions of dollars from the United States.  Bank of America's delay and obstruction tactics have taken various forms with the common result that homeowners with loans serviced by Bank of America, who are eligible for permanent loan modifications, and who have met the requirements for participation in the HAMP program, have not received permanent loan modifications to which they are entitled.

9.　　According to at least one former Bank of America employee, Bank of America exhibits a general attitude that it does not need to comply with HAMP and that the HAMP obligations will never be enforced against it.

10.　　In addition to its obligations based on its contract with the Treasury Department, Bank of America has entered into written agreements with individual homeowners, including Plaintiffs, for temporary loan modifications that must be converted to permanent loan modifications.  Plaintiffs and a similar class of borrowers have complied with the agreements by submitting the documentation asked of them and, when requested, by making payments.  Despite Plaintiffs' efforts, Defendants have ignored its contractual obligation to modify their loans permanently.

11.　　Because Bank of America is not meeting its contractual obligations, at least hundreds of Arizona homeowners are wrongfully being deprived of an opportunity to cure their delinquencies, pay their mortgage loans and save their homes.  By failing to live up to its obligations under the terms of the agreement it entered into with the Department of the

- 4 -

Treasury, and the terms of the contracts it formed with individual homeowners, Bank of America has left thousands of borrowers in a state of limbo – often worse off than they were before they sought a modification from Bank of America.  Defendants' actions violate their contractual obligations, thwart the purpose of HAMP, and are illegal under Arizona law.

12.     Plaintiffs, Teresa Follmer and John and Katie Lividotti, bring this suit on behalf of themselves and a Class of similarly situated Arizona residents ("Plaintiffs") to challenge the failure of Defendant Bank of America Bank, N.A. and its subsidiary BAC Home Loans Servicing, LP (collectively referred to as "Defendants" or "Bank of America") to honor the terms of their agreement with the United States Treasury for the intended benefit of homeowners, their failure to honor agreements directly with individual homeowners to modify mortgages to a point that they are affordable and sustainable, and to recover costs and losses incurred as a result.

## II.     JURISDICTION

13.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(d)(2) in that the matter is a class action wherein the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and members of the Class are citizens of a State different from the Defendants.

14.     This Court also has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1367 in that the Plaintiffs are intended, third-party beneficiaries to a contract between Bank of America and the U.S. Treasury that was entered into pursuant to and under the direction of TARP.  12 U.S.C. § 5201 *et seq.*

15.     This Court has personal jurisdiction over the parties in this action by the fact that Defendants are corporations that are licensed to do business in the state of Arizona or otherwise conduct business in the state of Arizona.

16.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) inasmuch as the unlawful practices are alleged to have been committed in this District, Defendants

regularly conduct business in this District, and one of the named Plaintiffs resides in this District.

### III.    PARTIES

17.    Plaintiff Teresa Follmer is an individual residing in Mesa, Arizona.

18.    Plaintiff Katie Lividotti resides in Chandler, Arizona.

19.    Plaintiff John Lividotti resided in Chandler, Arizona at the time most of the acts giving rise to this action occurred and currently resides in Linden, Michigan.

20.    Defendant Bank of America, N.A. is a mortgage lender headquartered in Charlotte, NC.  Defendant BAC Home Loans Servicing, LP is a subsidiary of Bank of America, N.A.  Defendants are collectively referred to as "Bank of America" and are currently doing business and maintaining office branches throughout the State of Arizona.

### IV.    FACTUAL BACKGROUND

**A.    The Foreclosure Crisis**

21.    Over the last three years, the United States has been in a foreclosure crisis.  A congressional oversight panel has recently noted that one in eight U.S. mortgages is currently in foreclosure or default.[2]

22.    Arizona registered the nation's second highest state foreclosure rate in 2009 with 6% of its housing units receiving at least one foreclosure filing during the year. The number of total Arizona properties with foreclosure filings in 2009 was 163,210.  This represents nearly a 40% increase over 2008.[3]

23.    In the first quarter of 2009, Arizona posted the nation's second highest foreclosure rate with 1 in every 54 houses receiving a foreclosure filing.  Arizona was one

---

[2]    Congressional Oversight Panel, Oct. 9, 2009 report at 3.  Available at http://cop.senate.gov/reports/library/report100909-cop.cfin.

[3]
http://www.realtytrac.com/contentmanagement/pressrelease.aspx?channelid=9&itemid=8333

of five states in 2009 that accounted for nearly 60 percent of the nation's first quarter total. Arizona had 49,119 foreclosure filings during the first quarter.[4]

24.     Economists predict that interest rate resets on the riskiest of lending products will not reach their zenith until sometime in 2011.  *See* Eric Tymoigne, *Securitization, Deregulation, Economic Stability, and Financial Crisis*, Working Paper No. 573.2 at 9, Figure 30, available at http://papers.ssrn.com/so13/papers.cfm?abstract_id=1458413 (citing a Credit Suisse study showing monthly mortgage rate resets).

**B.     Creation of the Home Affordable Modification Program**

25.     Congress passed the Emergency Economic Stabilization Act of 2008 on October 3, 2008 and amended it with the American Recovery and Reinvestment Act of 2009 on February 17, 2009 (together, the "Act").  12 U.S.C.A § 5201 *et seq.* (2009)

26.     The purpose of the Act is to grant the Secretary of the Treasury the authority to restore liquidity and stability to the financial system, and ensure that such authority is used in a manner that "protects home values" and "preserves homeownership."  *Id*.

27.     The Act grants the Secretary of the Treasury the authority to establish the Troubled Asset Relief Program, or TARP.  12 U.S.C. § 5211.  Under TARP, the Secretary may purchase or make commitments to purchase troubled assets from financial institutions. *Id*.

28.     Congress allocated up to $700 billion to the United States Department of the Treasury for TARP.  12 U.S.C. § 5225.

29.     In exercising its authority to administer TARP, the Act mandates that the Secretary "shall" take into consideration the "need to help families keep their homes and to stabilize communities."  12 U.S.C. § 5213(3).

30.     The Act further mandates, with regard to any assets acquired by the Secretary that are backed by residential real estate, that the Secretary "shall implement a plan that

---

[4]     http://www.keepmyhouse.com/2009/04/16/latest-foreclosure-statistics-us-foreclosures-increase-by-9/

seeks to maximize assistance for homeowners" and use the Secretary's authority over servicers to encourage them to take advantage of programs to "minimize foreclosures."  12 U.S.C. § 5219.  The Act grants authority to the Secretary of the Treasury to use credit enhancement and loan guarantees to "facilitate loan modifications to prevent avoidable foreclosures."  *Id*.

31.　　The Act imposes parallel mandates to implement plans to maximize assistance to homeowners and to minimize foreclosures.  12 U.S.C. § 5220.

32.　　On February 18, 2009, pursuant to their authority under the Act, the Treasury Secretary and the Director of the Federal Housing Finance Agency announced the Making Home Affordable program.

33.　　The Making Home Affordable program consists of two subprograms.  The first sub-program relates to the creation of refinancing products for individuals with minimal or negative equity in their home, and is now known as the Home Affordable Refinance Program, or HARP.

34.　　The second subprogram relates to the creation and implementation of a uniform loan modification protocol, and is now known as the Home Affordable Modification Program, or HAMP.  It is this subprogram that is at issue in this case.

35.　　HAMP is funded by the federal government, primarily with TARP funds. The Treasury Department has allocated at least $75 billion to HAMP, of which at least $50 billion is TARP money.

**C.**　　**Duties of a Participating Servicer Under HAMP**

36.　　Because Bank of America accepted $25 billion in federal funds and additional loan guarantees, it was required to participate in HAMP for the loans on which it functions as a loan "servicer."  On April 17, 2009, Steve R. Bailey, of Bank of America, N.A., executed a Servicer Participation Agreement ("SPA") with the federal government. A copy of this SPA is attached as Ex. 1.

37.     The SPA executed by Mr. Bailey incorporates all "guidelines," "procedures," and "supplemental documentation, instructions, bulletins, frequently asked questions, letters, directives, or other communications," referred to as "Supplemental Directives" issued by the Treasury, Fannie Mae or Freddie Mac in connection with the duties of Participating Servicers.  These documents together are known as the "Program Documentation" (SPA I.A.), and are incorporated by reference herein.  The SPA mandates that a Participating Servicer "shall perform" the activities described in the Program Documentation "for all mortgage loans it services."  SPA I.A., 2.A.[5]

38.     The first Supplemental Directive ("SD") was issued on April 6, 2009, and states that the national mortgage modification program was "aimed at helping 3 to 4 million at-risk homeowners – both those who are in default and those who are at imminent risk of default – by reducing monthly payments to sustainable levels."  Ex. 2 at p. 1.  This directive and the directives to follow were issued to provide guidance for adoption and implementation of HAMP "to provide a borrower with sustainable monthly payments."  *Id*.

39.     The Program Documentation requires Participating Servicers to evaluate *all loans* which are 60 or more days delinquent or appear to be in imminent default (as defined by the Program Documentation), to determine which loans meet the HAMP eligibility criteria.  *Id.* at p. 4.  In addition, if a borrower contacts a Participating Servicer regarding a HAMP modification, the Participating Servicer must collect income and hardship information to determine if the borrower is eligible for a HAMP modification.  *Id*. at pp. 3-4.

40.     A HAMP Modification consists of two stages.  First, a Participating Servicer is required to gather information and, if appropriate, offer the homeowner a Trial Period

---

[5]     The Program Documentation also includes Supplemental Directive 09-01 ("SD 09-01," attached hereto as Exhibit 2), Home Affordable Modification Program; Base Net Present Value (NPV) Model Specifications ("NPV Overview," attached hereto as Exhibit 3) and Supplemental Documentation-Frequently Asked Questions ("HAMP FAQS," attached hereto as Exhibit 4) and Supplemental Directive 09-08 ("SD 09-08," attached hereto as Exhibit 5).  These documents together describe the basic activities required under HAMP and are incorporated by reference in both of the TPP Agreements signed by Plaintiffs as well as herein.

Plan ("TPP").  Second, upon successful completion of the TPP, the Servicer must offer the

homeowner a permanent modification.[6]

41.     A Mortgage is eligible for the HAMP if criteria enumerated in the Program

Documentation are met.  Aside from criteria that require that the loan be a first lien

mortgage originated before 2009, that the property be occupied, and that it be the

borrower's principal residence, the most salient conditions are that the loan is delinquent or

default is reasonably foreseeable; that the borrower documents a financial hardship (as

defined in the Program Documentation); and that the "borrower has a monthly mortgage

payment ratio of greater than 31 percent" of the borrower's monthly income.  *Id*. at p. 2.

42.     The servicer must "provide a borrower with clear and understandable written

information about the material terms, costs, and risks of the modified mortgage loan in a

timely manner to enable borrowers to make informed decisions."  *Id*. at p. 13.

43.     Once the participating servicer has determined a mortgage borrower's

eligibility in the HAMP, the servicer must apply the modification steps enumerated in the

Program Documentation, in the stated order of succession until the borrower's monthly

mortgage payment ratio is reduced to 31 percent of the borrower's monthly income.  These

steps include capitalizing accrued interest and escrow advances, reducing the interest rate,

extending the term and re-amortizing the loan (if necessary), and providing a principal

forbearance (if necessary).  *See* Ex. 2 at pp. 8-10; *see also* Ex. 3 at p. 2.

44.     After applying the enumerated modification steps to calculate the modified

payment amount, a servicer must offer the borrower a TPP.  The TPP consists of a three-

month period in which the homeowner makes mortgage payments based on the

modification formula stated in the Program Documentation.  Bank of America uses a

standard form agreement to offer TPPs to eligible homeowners.  This agreement describes

---

[6]     The eligibility criteria for HAMP, as well as the formula used to calculate monthly
mortgage payments under the modification, are explained in detail in Exhibit 2.  Generally
speaking, the goal of a HAMP modification is for owner-occupants to receive a
modification of a first-lien loan by which the monthly mortgage payment is reduced to 31%
of their monthly income for the next five years.

the homeowner's duties and obligations under the plan and promises a permanent HAMP modification for those homeowners that execute the agreement and fulfill the documentation and payment requirements.

45.     If the homeowner executes the TPP Agreement, complies with all documentation requirements and makes all three TPP monthly payments, the second stage of the HAMP process is triggered, in which the homeowner must be offered a permanent modification.  The payment amount and interest rate in the modified loan are fixed for five years and equal to the payment amount and interest rate in the TPP.  Thereafter, the rate may escalate annually by up to one percent until it reaches an interest cap which is the lesser of:  (i) the fully indexed and fully amortizing contract rate or (ii) the Freddie Mac Primary Mortgage market Survey rate for 30-year fixed rate mortgage loans on the date the modification is prepared.  Once capped, the rate is fixed for the remainder of the term.  *See* Ex. 2 at p. 9.

46.     Subject to minor adjustments that can be made to account for changes in the income as documented and verified, HAMP directs that the terms of the Trial Plan automatically made permanent upon a homeowners successful completion of the Plan.  SD 09-01 states that "[i]f the borrower complies with the terms and conditions of the Trial Period Plan, the loan modification will become effective on the first day of the month following the trial period as specified in the Trial Period Plan."  Ex. 2 at p. 18.

47.     HAMP prohibits a participating servicer from taking several actions including the following:

- Proceeding with a foreclosure sale.  Any foreclosure sale must be suspended and no new foreclosure action may be initiated during the trial period, and until the borrower has been considered and found ineligible for other available foreclosure prevention options.  *See* Ex. 4 at Q63; *see also* Ex. 2 at p. 14.

- Requiring a borrower to make an initial contribution payment pending the processing of the trial period plan before the plan starts.  Ex. 4 at Q. 83.
- Soliciting borrowers to opt out of consideration for HAMP during the temporary review period.  Ex. 6 at Q1230-02.
- Reporting borrowers as delinquent to credit reporting bureaus without explanation.  For borrowers who are current when they enter a trial period, the servicer should report the borrower current but on modified payment if the borrower makes timely payments during the trial period.  For borrowers who are delinquent when they enter the trial period, the servicer should report in such a manner that accurately reflects the borrower's current workout status.  Ex. 2 at p. 22.
- Assessing prepayment penalties for full or partial prepayment as part of the modification.  Ex. 4 at Q. 25.

48.     The HAMP requires a participating servicer to send a Borrower Notice to every borrower that has been evaluated for HAMP but is not offered a Trial Period Plan, is not offered an official HAMP modification, or is at risk of losing eligibility for HAMP because they have failed to provide required financial documentation.  Ex. 5 at p. 1.

49.     The HAMP presumes that final modifications will be extended and finalized upon completion of a TPP or shortly thereafter.  HAMP Supplemental Documentation dated December 22, 2009 addresses situations in which the borrower has completed the TPP but has not yet received a permanent modification.

> In situations where an eligible borrower successfully completed the trial period and should have been converted to a permanent modification, but for reasons beyond their control were not timely evaluated for a permanent modification, the servicer must promptly make a determination as to whether the borrower is eligible for a permanent HAMP modification.  If the borrower is eligible, then the servicer must offer the borrower a permanent HAMP modification as soon as possible, but in no event later than sixty days after discovering the error.

Ex. 6 at Q1222-01.

50.     By entering into the SPA, Bank of America covenanted that all services will be performed in compliance with all applicable Federal, state and local laws, specifically including state laws designed to prevent unfair, discriminatory or predatory lending practices.  Ex. 1 at ¶ 5(b).

51.     Under the SPA, Bank of America also covenanted that it would perform the services required under the Program Documentation and the Agreement in accordance with the practices, high professional standards of care, and degree of attention used in a well managed operation, and no less than which Bank of America exercises for itself under similar circumstances, and that Bank of America would use qualified individuals with suitable training, education, experience and skills to perform the Services.  *Id*. at ¶ 5(d).

52.     Bank of America has routinely failed to meet its obligations under the SPA and the Program Directives.  Mortgage borrowers who request to be evaluated for a modification under HAMP routinely face unexplained delays and go weeks or months with no communication from Bank of America after providing the requested information. Borrowers who attempt to contact Bank of America by telephone face long periods of time on hold and are transferred between service representatives in a deliberate effort to cause the borrower to give up and to terminate the call.  Bank of America regularly falsely informs borrowers that it did not receive requested information and demands that documents be re-sent.

53.     Bank of America has routinely failed to live up to its end of the TPP Agreement and offer permanent modifications to homeowners.  In January 2010, the U.S. Treasury reported that Bank of America had 1,066,025 HAMP-eligible loans in its portfolio.  Trial periods have been started on only 237,766 of these loans.  Of those, just 12,761 resulted in permanent modifications (only 5% of the started Trial modifications and just over 1% of the eligible pool) even though many more homeowners had made the payments and submitted the documentation required by the TPP Agreement.  The Treasury Report is attached hereto as Exhibit 7.

54.     Former Bank of America employees have confirmed that Bank of America is not complying with HAMP in a manner that can only be considered deliberate.  Bank of America's general practice and culture is to string homeowners along with no intention of providing actual and permanent modifications.  Instead, Bank of America has put processes in place that are designed to foster delay, mislead homeowners and avoid modifying mortgage loans.

55.     A delay tactic a former employee described Bank of America commonly using is encouraging or even requiring homeowners to resubmit financial information each time the customer calls in to inquire about a pending modification.  Any change in financial information – even a small change – then causes BofA to restart the application process under the pretext of changed factual information.

56.     Bank of America customer service representatives are instructed to mislead homeowners who call to inquire about loan modifications for which they have applied. According to former employees, customer service representatives regularly inform homeowners that modification documents were not received on time or not received at all when, in fact, all documents have been received.  Similarly, homeowners are regularly told that documents were sent on a particular date when, in fact, they had not been sent at all.

57.     A former Bank of America employee has confirmed that Bank of America regularly ignores completed loan modifications by not properly reflecting the modification in its computer system.  Bank of America continues to treat the loan as delinquent by sending delinquency notices, reporting homeowners as delinquent to credit reporting agencies, and by instituting foreclosure proceedings.

58.     A former employee has confirmed that Bank of America regularly fails to properly credit payments homeowners make under a Trial Payment Plan.  Bank of America commonly applies payments to late fees or foreclosure fees and then deems a payment the homeowner made under a trial plan to be insufficient.  Bank of America's regular practice is to place payments a homeowner makes into a suspense account or "partial payment

balance account" and not to credit the homeowner's regular mortgage account.  This results in Bank of America treating a homeowner who has made timely payments under a Trial Plan as delinquent.

59.    A former employee has confirmed that Bank of America does not employ the "waterfall" method mandated by HAMP.  In addition, at least one former employee recalls seeing homeowners' financial records manipulated in Bank of America's computer system to the homeowners' detriment.

60.    Despite the HAMP directives regarding the specific manner in which homeowners in the process of applying for a modification or in a Trial Period Plan are to be reported to credit reporting agencies, a former employee has seen that Bank of America's practice is to report homeowners to credit reporting agencies as being delinquent without any further explanation thereby further damaging the homeowners' credit.

61.    Former Bank of America employees attests to seeing records regarding hundreds of homeowners in Trial Plans but recalls none who had a trial plan properly converted to a permanent plan following three or even four successful payments.  According to the experience of this former employee, the vast majority of homeowners who seek a HAMP modification with Bank of America do not ever receive a permanently modified loan but are instead delayed indefinitely.

62.    By failing to live up to the TPP Agreement and convert TPPs into permanent modifications, Bank of America is leaving homeowners in limbo, wondering if their home can be saved and preventing homeowners from pursuing other avenues of resolution, including using the money they are putting toward TPP payments to fund bankruptcy plans, relocation costs, short sales or other means of curing their default.

**D.    Plaintiffs' Efforts to Obtain a Loan Modification**

**1.    Teresa Follmer**

63.    Plaintiff Teresa Follmer and her husband originally purchased their home at 2622 E. Garnet Ave. Mesa Arizona 85204 in 1993.  In March of 1999, Ms. Follmer became

the sole owner of the home and refinanced it with mortgage through Full Spectrum Lending – a division of Countrywide that was later purchased by Bank of America.  The home is still Ms. Follmer's primary residence.

64.    In June of 2007, Ms. Follmer refinanced through First Magnus Financial Corp.  The mortgage was a conventional 30-year fixed rate loan at 7.875%, and required a monthly payment of $2,463.88 for principal and interest, taxes and insurance.  The lender represented to Ms. Follmer that the loan was a temporary loan and that within six months she would be able to get a better loan with a much smaller payment and interest rate.  This promised refinance never occurred.  The loan was transferred to Countrywide – to whom Ms. Follmer made her monthly payments.

65.    In early 2008 Ms. Follmer's business as an interior designer waned due to the severe slowdown in the economy and the housing market, Ms. Follmer found herself experiencing severe financial hardship herself.  As a result Ms. Follmer fell behind on her mortgage payments.

66.    In September of 2008, at the request of Countrywide, Ms. Follmer withdrew most of the balance in her 401(k) to pay for the arrearages on her mortgage and late fees.

67.    Throughout late 2008 and early 2009, Ms. Follmer called and wrote to Countrywide several times, requesting it modify her mortgage.  Ms. Follmer was instructed to send in bank statements, a list of household expenses, and proof of income with pay stubs.  Ms. Follmer gathered, compiled, and provided this information to Countrywide.

68.    In March of 2009, Ms. Follmer received a call from a Countrywide representative who told her that the only thing she potentially qualified for was a home saver advance loan in the amount of $12,496.61, which would cure the default on her home loan but would require an additional monthly payment of $101.12 beginning in December of 2009.    On April 24, 2009, Ms. Follmer received a package from Countrywide stating that she had been approved for the home saver advance loan and that she needed to sign

- 16 -

and return the documents enclosed within the next four days.  Ms. Follmer signed and returned the documents immediately.

69.     On May 3, 2009, Ms. Follmer called to verify that the paperwork she had returned was received and accepted by Countrywide.  She was told that it had not been received, that the deadline had not been met, and that her application for the home saver advance loan was denied.  Ms. Follmer was then told that she should short sell her home immediately in order to avoid foreclosure.

70.     On May 4, 2009, Ms. Follmer went to the making homes affordable website where she learned that she qualified for participation in the HAMP program.  Ms. Follmer then contacted Countrywide to apply for a HAMP loan modification but she was told that they did not have a system in place to do such modifications.

71.     On May 10, 2009, Ms. Follmer contacted the Arizona Department of Financial Institutions to inquire into filing a complaint against Countrywide and Bank of America.  As a result, in June of 2009, Gina Williams from Bank of America sent Ms. Follmer a letter requesting she again gather and compile financial information for Bank of America, for a second time.  Ms. Follmer faxed the information to Bank of America on June 10, 2009.  The following day Bank of America verified it had received Ms. Follmer's request and documents and that nothing else was needed for her application.

72.     On June 17, 2009, Gina Williams called Ms. Follmer and asked her to sign a temporary forbearance agreement that would relieve her of having to make payments from June through August of 2010.  Ms Williams faxed the agreement to Ms. Follmer who signed and faxed it back immediately.

73.     On June 18, 2009, Ms. Follmer received a letter from Bank of America indicating its intent to accelerate her loan and foreclose on her home.

74.     On August 29, 2009, Ms. Williams contacted Ms. Follmer and informed her that her case was being reassigned to Kristy Lam because Ms. Williams was being transferred to another department.  Ms. Follmer contacted Ms. Lam and asked for an update

on the status of her application for modification. About a week later, Ms. Lam instructed that Ms Fulmer needed to restart the entire application process, submit a new application, gather and submit all of her financial records again – for the third time.

75.     On September 14, 2009, Ms. Follmer submitted the application and paperwork again.

76.     On October 15, 2009, Ms. Follmer received a package from Bank of America entering her into a trial payment period under the HAMP program.  The letter stated that Ms. Follmer was to make an immediate trial period payment of $1,243.16, which she did.

77.     On October 18, 2009, Ms. Follmer received a packet from Bank of America requiring her and her mother to sign a hardship affidavit, provide verification of income, sign a request for transcript of her tax return, and provide a letter explaining that Ms. Follmer's mother no longer lived there or contributed to the mortgage payments.  The packet said that the information and Ms. Follmer's initial trial payment must all must be submitted by December 1, 2009, and that she must continue to make the trial period payments over the next three months.  Ms. Follmer returned the information prior to the deadline and made all three trial period payments.

78.     On January 5, 2010, Ms. Follmer received a statement from Dyke O'Neal stating that she owed payments for the home saver advance loan - which was paid directly to Bank of America.

79.     On January 20, 2010, Ms. Follmer received a letter from Bank of America stating that Ms. Follmer's trial period payments began on November 1, 2009, and that the bank had only received two of the three payments required.  The letter continued by telling Ms. Follmer to make her trial period payment and to provide additional copies of the previously provided financial information within the next 30 days in order to be eligible for consideration under the HAMP program.

80.     Ms. Follmer sent Bank of America the requested financial information on January 21, 2010, and called to provide the bank with the confirmation number for the

- 18 -

1   payment the bank said it had not received and to inquire into whether the bank needed

2   anything else.  At that time the bank informed Ms. Follmer, for the first time, that it needed

3   Ms. Follmer's mother, who was also on title, to execute a quitclaim deed back to Ms.

4   Follmer.

5       81.     On February 1, 2010, Ms. Follmer made her third trial period payment.

6       82.     On February 20, 2010, Bank of America sent Ms. Follmer a letter thanking

7   her for the final trial payment and documents requested.  The bank again asked Ms. Follmer

8   to provide copies of her most recent pay stubs, her federal tax return, and a release form for

9   her federal tax returns.  Ms. Follmer again sent the requested financial information. She has

10  provided all documentation Bank of America has requested, including the executed

11  quitclaim deed from her mother.

12      83.     On March 23, 2010, a Bank of America representative verified that the bank

13  had received the quit claim and other documents and that there was nothing more Ms.

14  Follmer needed to provide.  At the representative's direction, Ms. Follmer resumed making

15  her trial period payments.

16      84.     On April 23, 2010, Ms. Follmer received a letter form Bank of America

17  stating that she was required to enter into credit counseling in order to be accepted into the

18  HAMP program.  Ms. Follmer called the same day and informed Annette from the bank

19  that she had already been participating in credit counseling for months and that she had sent

20  it the information showing that she was at least three times.

21      85.     On May 6, 2010, Ms. Follmer received a letter from the bank stating that she

22  was not eligible for a loan modification and claiming that she had not made her requisite

23  three trial period payments.  Ms. Follmer called Bank of America that same day and

24  provided a representative with confirmation numbers for each of her payments.  The

25  representative put Ms. Follmer on hold and then told her that they were going to enter her

26  into the process all over again and send her another packet.  Ms. Follmer has never received

27  the packet.

28

- 19 -

86.     On June 13, 2010, Ms. Follmer received an acceleration and foreclosure notice informing her that she has until July 11, 2010, to pay $23,988.34 plus her regular monthly payment and late fees or she would lose her home.

87.     Ms. Follmer has spent a significant amount of time and money, at Bank of America's direction, in order to obtain a loan modification - including but not limited to making the required payments, paying postage and fax fees, and dozens of hours on the telephone.

88.     Like hundreds or even thousands of Arizona residents, Ms. Follmer has been living in limbo, without any assurances that her home will not be foreclosed, despite compliance with the requirements of the modification agreement and continued monthly payments under the agreement dictated by Bank of America.  She has invested her limited resources in modified payments based on the promise that doing so would result in a permanent loan modification.

**2.     John and Katie Lividotti**

89.     Plaintiffs John and Katie Lividotti purchased their home, in which Katie Lividotti still lives as her primary residence, in August of 1999.  They financed the purchase with a 30-year fixed mortgage from GMAC.  In October of 2007, after being solicited by Countrywide, Mr. and Mrs. Lividotti refinanced their home.  Their new mortgage was originated by Countrywide Home Loans located at 1295 W. Washington #106, Tempe, Arizona 85281 and transferred to Bank of America via Countrywide Mortgage.  The loan is a conventional loan at a fixed rate of 6.5%.  The mortgage required a monthly principal, interest, taxes, and insurance payment of $936.17.

90.     Mr. and Mrs. Lividotti separated in June of 2008.  Mr. Lividotti moved to Michigan and Mrs. Lividotti stayed in the Chandler home.  Due to the decrease in household income and increased living expenses the Lividottis began to experience severe financial hardship.

91.     In approximately October of 2009, Ms. Lividotti contacted the Neighborhood Assistance Corporation of America ("NACA") to assist her in obtaining a loan modification with their lender and loan servicer.  The Lividottis provided all personal and financial information requested by NACA that would be forwarded to Bank of America.  These documents included bank statements, paycheck information, and a signed hardship letter.

92.     Between October 2009 and February 2010, the Lividottis were consistently informed by Bank of America and by NACA that a modification was in process.  In February of 2010 Mr. and Mrs. Lividotti received a letter stating that the modification had been approved.  The NACA website also showed that their modification had been approved.  In February or March of 2010, Mr. and Mrs. Lividotti received a letter from Bank of America stating that the modification had been approved and that they could start making payments in the modified amounts of $678.10 starting in April of 2010.

93.     After making the second modified payment in April 2010, the Lividottis received a notice of Bank of America's intent to accelerate the loan and foreclose on the property.  Ms. Lividotti was in contact with Bank of America either over the phone or in person at least three times a week for the next six weeks.  During Ms. Lividotti's calls to Bank of America to try and save her home, she was regularly put on hold for an hour or more, transferred to multiple departments and hung up on.  After over 100 calls to Bank of America, Ms. Lividotti was not able to reach someone who could provide her with accurate information about her modification or the notice to accelerate and foreclose.

94.     In April of 2010, Ms. Lividotti repeatedly went to a Bank of America branch and spoke with Nicole Gardiola, Charles Hildebran, Melissa Nicolaus and others - all of whom were Bank of America representatives.  Despite the fact that the Lividottis were previously informed that the modification was approved and their loan had been modified, these representatives all informed her that her modification was in process and that they could not provide her with any information regarding when it would be finalized or

processed.  They referred her to NACA who in turn told her to contact Bank of America directly.

95.     As of July 1, 2010, the NACA website now shows Bank of America is requiring the Lividottis to obtain and provide financial information (most recent pay stubs, tax statements, insurance information and another letter of hardship) and records for the fourth time.

96.     Mr. and Mrs. Lividotti made two timely modified payments of $678.10 in February and March of 2010.  Bank of America accepted each payment and cashed each check.

97.     On April 15, 2010, Ms. Lividotti went in to a Bank of America branch office to make her third modified payment.  At that time Bank of America refused to accept her payment, as stated by Charles Hildebran, because the bank showed she owed multiple payments.  The bank did not acknowledge Ms. Lividotti's payments from February or March.

98.     On April 19, 2010, Bank of America sent a letter to the Lividottis stating its intent to accelerate their loan and foreclose on their home.

99.     To avoid foreclosure, on April 26, 2010, Ms. Lividotti mailed a check for $547.97 for the amount Bank of America stated was past due.  Based upon information and belief this constituted the difference between the modified payments she had made and the original payment amounts, late fees, and a $15 fee for sending someone out to verify the home was occupied.  Bank of America accepted these payments and cashed these checks, but continued to report the account as delinquent to credit reporting agencies.  Bank of America received and cashed that check on April 28, 2010.

100.     Due to the conflicting information Bank of America had given Ms. Lividotti regarding the modification, the payment amounts due, and the status of her account, on April 28, 2010, Ms. Lividotti went in to a Bank of America branch to ask what her payment amount was and to make a payment.  She was told by Charles Hildebran that she owed an

amount in excess of her original loan payment of $936.30, because the bank had not recorded her April 26, 2010 payment and because it added late fees and a $15 fee for sending someone out to the house to verify it was occupied.

101.    On June 1, 2010, Ms. Lividotti went to a Bank of America branch office where she was told that her payment amount was $914.79, so she paid that amount.

102.    On June 30, 2010, Ms. Lividotti went into a Bank of America branch office where she was told her payment amount was $914.29, so she paid that amount.

103.    Ms. Lividotti contacted Bank of America several times between January and May of 2010 in order to request that it correct its erroneous reports to the credit reporting agencies.  Ms. Lividotti was told by Nicole Gardiola, Kimberly Kramer, and others from Bank of America - after her third request that it correct the erroneous reports it had submitted to the credit bureaus - that doing so would make the modification null and void. Ms. Lividotti disagreed with them and said that correcting the bank's own mistakes had nothing to do with her loan modification.

104.    Despite Mr. and Mrs. Lividotti's compliance with all of Bank of America's instructions, and the loan modification agreement, Bank of America has not decreased the amount of Mr. and Mrs. Lividotti's loan or payment amounts as agreed.

105.    Ms. Lividotti and her husband have spent significant time and money in efforts to modify this loan with Bank of America including but not limited to making payments in person at the bank, paying postage and fax fees, and dozens of hours on the telephone.

106.    Like hundreds or even thousands of Arizona residents, Mr. and Ms. Lividotti have been living in limbo, without any assurances that their home will not be foreclosed, despite compliance with the requirements of the modification agreement and continued monthly payments under the agreement dictated by Bank of America.  They have invested their limited resources in modified payments based on the promise that doing so would result in a permanent loan modification.

**E.      Class Allegations**

107.    Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

108.    Plaintiffs bring this action under Rule 23 of the Federal Rules of Civil Procedure, on behalf of themselves and a Class consisting of:

> All Arizona homeowners whose loans have been serviced by one or both Defendants and who, since April 13, 2009, have requested or been otherwise eligible for a TPP under the terms of HAMP Program Documentation and whose loan Bank of America has not permanently modified either because Bank of America has not offered them a TPP, because they did not receive a permanent loan modification after they complied with their obligations under HAMP as conveyed to them by Bank of America, or because Bank of America has not honored the terms of a permanent modification agreement.

109.    Excluded from the Class are governmental entities, Defendants, their affiliates and subsidiaries, Defendants' current or former employees, officers, directors, agents, representatives, their family members, the members of this Court and its staff.

110.    Plaintiffs do not know the exact size or identities of the members of the proposed class, since such information is in the exclusive control of Defendants.  Plaintiffs believe that the Class encompasses many hundreds and perhaps thousands of individuals whose identities can be readily ascertained from Defendants' books and records. Therefore, the proposed Class is so numerous that joinder of all members is impracticable.

111.    Based on the size of the modifications at issue, Plaintiffs believe the amount in controversy exceeds $5 million.

112.    All members of the Class have been subject to and affected by the same conduct.  The claims are based on the terms of a single unifying contract between Bank of America and Fannie Mae, acting as agent for the United States Treasury, and on form contracts and uniform loan modification processing requirements.  There are questions of law and fact that are common to the class, and predominate over any questions affecting

only individual members of the Class. These questions include, but are not limited to the following:

      a.    The nature, scope and operation of Bank of America's obligations to homeowners under HAMP;

      b.    Whether Bank of America breached its duties under HAMP that were intended for the benefit of Class members;

      c.    Whether the manner in which Bank of America has executed the duties it undertook as part of the HAMP program violates its duty of good faith and fair dealing;

      d.    Whether Bank of America's receipt of an executed TPP Agreement, along with supporting documentation and three monthly payments, creates a binding contract or otherwise legally obligates Bank of America to offer Class members a permanent HAMP modification;

      e.    Whether Bank of America's failure to provide permanent HAMP modifications in these circumstances amounts to a breach of contract and/or a breach of the covenant of good faith and fair dealing;

      f.    Whether Bank of America demanded and collected initial payments from eligible homeowners in violation of HAMP provisions;

      g.    Whether Bank of America's written representations to homeowners stating that they would receive permanent loan modifications upon successful completion of the trial period and then failing to deliver such permanent modification constitutes an unlawful act under the Consumer Fraud Act ("CFA");

      h.    Whether the above practices caused Class members to suffer injury; and

      i.    The proper measure of damages and the appropriate injunctive relief.

113.   The claims of the individual named Plaintiffs are typical of the claims of the Class and do not conflict with the interests of any other members of the Class in that both the Plaintiffs and the other members of the Class were subject to the same conduct, were subject to the terms of the same agreement and were met with the same absence of a permanent modification.

114.   The individual named Plaintiffs will fairly and adequately represent the interests of the Class.  They are committed to the vigorous prosecution of the Class's claims and have retained attorneys who are qualified to pursue this litigation and have experience in class actions – in particular, consumer protection actions.

115.   A class action is superior to other methods for the fast and efficient adjudication of this controversy.  A class action regarding the issues in this case does not create any problems of manageability.

116.   This putative class action meets the requirements of Fed. R. Civ. P. 23(b)(2) and Fed. R. Civ. P. 23(b)(3).

117.   Bank of America has acted or refused to act on grounds that apply generally to the Class so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole.

## COUNT I

### BREACH OF CONTRACT / BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING

118.   Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

119.   Plaintiffs bring this claim on their own behalf and on behalf of each member of the Class described above.

120.   The SPA and the explicitly incorporated Program Documentation constitute a contract for which Plaintiffs and the Class are intended beneficiaries, and under which Bank of America has undertaken duties to act for the benefit of Plaintiffs and the Class.

121.    By entering into the SPA and accepting valuable consideration including $25 billion in funds from the U.S. Treasury, Bank of America covenanted, on behalf of itself and its subsidiaries, to administer its contractual obligations with principles of good faith and fair dealing.

122.    Bank of America has breached its contractual duties by failing to provide eligible borrowers with the opportunity to accept permanent loan modifications and by wrongfully collecting introductory payments.

123.    In addition to duties to Plaintiffs based on their status as third-party beneficiaries of the SPA, Bank of America entered into individual contracts directly with Plaintiffs.

124.    The Agreement sent by Bank of America to Plaintiffs constitutes a valid offer.

125.    By executing the Agreement and returning it to Bank of America, along with the supporting documentation, Plaintiffs accepted Bank of America's offer.

126.    Alternatively, Plaintiffs' return of the Agreement constitutes an offer. Acceptance of this offer occurred when Bank of America accepted Plaintiffs' TPP payments.

127.    Plaintiffs' TPP payments to Bank of America constitute consideration.  By making those payments, Plaintiffs gave up the ability to pursue other means of saving their home.

128.    Plaintiffs and Bank of America thereby formed valid contracts.

129.    To the extent that the contracts were subject to a condition subsequently providing Bank of America an opportunity to review the documentation submitted by Plaintiffs when they returned the signed TPP, this condition was waived by Bank of America and/or it is estopped to assert it as a defense to Plaintiffs' claims.

130.    By failing to offer Plaintiffs permanent HAMP modifications, Bank of America breached those contracts.

- 27 -

131.    Bank of America routinely and regularly breaches its duties under both the SPA and their contract with individual Plaintiffs by failing to retain, employ, and supervise adequately trained staff; instituting and/or continuing with foreclosure proceedings against borrowers in a trial program; failing to provide written notices required by HAMP; and by deliberately acting to delay and otherwise frustrate loan modification processes; routinely demanding information already in its files; making inaccurate calculations and determinations of Plaintiffs' eligibility for HAMP; and failing to follow through on written and implied promises.

132.    Plaintiffs remain ready, willing and able to perform under the contracts by continuing to make TPP payments and provide documentation.

133.    Plaintiffs have suffered harm and are threatened with additional harm from Bank of America's breach.  By making TPP payments both during and after the TPP, Plaintiffs forego other remedies that might be pursued to save their homes, such as restructuring their debt under the bankruptcy code, or pursuing other strategies to deal with their default, such as selling their home.  On information and belief, some putative Class members have suffered additional harm in the form of foreclosure activity against their homes.

## COUNT II

## PROMISSORY ESTOPPEL, IN THE ALTERNATIVE

134.    Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

135.    Plaintiffs bring this claim on their own behalf and on behalf of each member of the Class described above.

136.    Bank of America, by way of its TPP Agreements, made a representation to Plaintiffs that if they returned the TPP Agreement executed and with supporting documentation, and made their TPP payments, they would receive a permanent HAMP modification.

137.    Bank of America's TPP Agreement was intended to induce Plaintiffs to rely on it and make monthly TPP payments.

138.    Plaintiffs did indeed rely on Bank of America's representation, by submitting TPP payments.

139.    Given the language in the TPP Agreement, Plaintiffs' reliance was reasonable.

140.    Plaintiffs' reliance was to their detriment.  Plaintiffs have yet to receive permanent HAMP modifications and have lost the opportunity to fund other strategies to deal with their default and avoid foreclosure.

## COUNT III

## CONSUMER FRAUD VIOLATION OF ARIZ. REV. STAT. §§ 44-1521 -1534

141.    Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

142.    Plaintiffs bring this claim on their own behalf and on behalf of each member of the Class described above.

143.    The conduct of Bank of America as set forth herein constitutes the making of false promises and misrepresentations regarding its provision of loan modifications to borrowers in violation of Ariz. Rev. Stat. §§ 44-1521 -1534.

144.    Bank of America's false promises and misrepresentations were made to the U.S. Government in order to obtain billions of dollars in TARP funds.

145.    Bank of America's false promises and misrepresentations were also made directly to borrowers in order to obtain the performance of services including the collection and compilation of financial documents and data, the provision of other information, and certain payments from borrowers.  This also includes its practice of leading borrowers to believe that it had either already permanently modified their loans or would permanently modify their loans upon successful completion of certain terms or a trial program.

146.   Plaintiffs and Class members relied on Bank of America's conduct as set forth herein and resulted in the loss of money or property to Plaintiffs and Class members.

## V.   PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs respectfully request the following relief:

A.   Certify this case as a class action and appoint the named Plaintiffs to be Class representatives and their counsel to be Class counsel;

B.   Enter a judgment declaring the acts and practices of Bank of America complained of herein to constitute a breach of contract and a breach of the covenant of good faith and fair dealing, as well as a declaration that they are required by the doctrine of promissory estoppel to offer permanent modifications to Class members;

C.   Grant a permanent or final injunction enjoining Bank of America's agents and employees, affiliates and subsidiaries, from continuing to harm Plaintiffs and the members of the Class;

D.   Order Bank of America to adopt and enforce a policy that requires appropriate training of their employees and agents regarding their duties under HAMP;

E.   Order specific performance of Bank of America's contractual obligations together with other relief required by contract and law;

F.   Reduce the amount of indebtedness of each Plaintiff and each Class member by the amounts Defendants have wrongfully claimed to be owed due to payment amounts, interest and fees, that do not comply with HAMP or with contracts directly with Plaintiffs or Class members;

G.   Award restitution as wells as actual and statutory damages to the Plaintiffs and the Class in amounts to be proven at trial;

H.   Award Plaintiffs the costs of this action, including the fees and costs of experts, together with reasonable attorneys' fees; and

I.   Grant Plaintiffs and the Class such other and further relief as this Court finds necessary and proper.

1

### VI.   JURY TRIAL DEMANDED

2

Plaintiffs demand a trial by jury on all issues so triable.

3

4

RESPECTFULLY SUBMITTED this 7th day of July, 2010.

5

6
                                   HAGENS BERMAN SOBOL SHAPIRO LLP

7
                                   By:   s/Robert B. Carey

8
                                   Robert B. Carey
                                   Don Andrew St. John

9
                                   11 West Jefferson Street, Suite 1000
                                   Phoenix, AZ  85003

10
                                   (602 840-5900

11
                                   rcarey@hbsslaw.com
                                   andy@hbsslaw.com

12

13
                                   HAGENS BERMAN SOBOL SHAPIRO LLP

14
                                   Steve W. Berman
                                   Ari Y. Brown

15
                                   1918 Eighth Avenue, Suite 3300
                                   Seattle, WA  98101

16
                                   (206) 623-7292

17
                                   steve@hbsslaw.com
                                   ari@hbsslaw.com

18

19
                                   *Attorneys for Plaintiffs*

20

21

22

23

24

25

26

27

28